2008 WY 10

Wynn L. CHRISTENSEN, Renee C. Hunter, and Rex E. Christensen, Appellants (Plaintiffs),

v.

C. Burke CHRISTENSEN, individually and in his capacity as President of 7–C Industries, Inc., and Peggy C. Miller, individually and in her capacity as Secretary of 7–C Industries, Inc., Appellees (Defendants),

and

Joan S. Hamblin and Diane C. Buxton, Appellees (Defendant–Intervenors).

No. S–07–0061.

Supreme Court of Wyoming.

Feb. 1, 2008.

Representing Appellants: David G. Lewis, Jackson, Wyoming.

Representing Appellees: Franklin J. Falen, Brandon L. Jensen, Kathryn Brack Morrow of Budd–Falen Law Offices, LLC, Cheyenne, Wyoming. Argument by Ms. Morrow.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] Wynn L. Christensen, Renee C. Hunter and Rex E. Christensen (Buyers) brought an action against their siblings, C. Burke Christensen, Peggy C. Miller, Joan S. Hamblin and Diane C. Buxton (Sellers), seeking interpretation of a stock purchase agreement and enforcement of a provision of their mother's will. On cross motions for summary judgment, the district court granted Sellers summary judgment on all of the claims. The district court concluded that Sellers had acted in accordance with the terms of the stock purchase agreement in attempting to sell their shares of stock to a non-family buyer and the will provision at issue was inconsistent with the agreement and invalid. We affirm the summary judgment order as it pertains to the stock purchase agreement. We decline to consider the will provision.

## ISSUES

[¶ 2] Buyers present the following issues for this Court's determination:

A. Whether the defendants' proposal to sell their shares of stock in 7C Industries, Inc. to the plaintiff shareholders in either January or February, 2006, was performed consistent with the requirements of the Mutual Stock Purchase Agreement executed by all the plaintiffs and defendants on February 28, 1972.

B. Whether the Mutual Stock Purchase Agreement authorized the sale of 7C shares of stock to third parties under any circumstances.

C. Whether the shares of stock received by the plaintiffs and defendants from the probate of their Mother Nola's

Last Will and Testament were lawfully burdened with the transfer restrictions required by the Last Will.

## FACTS

[¶ 3] The parties to this appeal are seven brothers and sisters who are the sole stockholders of 7–C Industries, Inc. (7–C). The primary asset of the corporation is approximately 103 acres of land located in Teton County, Wyoming. Their parents, Irvin and Nola Christensen (Irvin and Nola), now deceased, established 7–C in 1972 and jointly held a large majority of the corporate stock.

[¶ 4] Shortly after forming 7–C, Irvin and Nola had their attorney draft the stock purchase agreement at issue in this case. They and their seven children signed the agreement in 1972. It was intended to provide for the purchase by the surviving shareholders of a shareholder's interest upon his or her death; the purchase by other shareholders of a shareholder's interest during his or her lifetime if he or she chose to sell; and a method for obtaining funds to carry out the above purchases.

[¶ 5] Over the years, Irvin and Nola gifted shares of the corporate stock to each of their children. In 1985, Nola died. Pursuant to her will, a substantial number of her shares passed to Irvin and 134 shares passed to each of her children. Before his death in 1998, Irvin gifted all of his shares to the seven children with the result that each of them owns a nearly equal number of shares.[1]

[¶ 6] After their father's death, relations between the siblings deteriorated. Sellers, who owned a majority of the stock, sought to resolve the problems in various ways, including dissolving the corporation, selling the land, or dividing the land among the stockholders. In 2006, they began discussions about selling their stock to an outside buyer. Each of the Sellers notified the corporate secretary and other stockholders of their desire to sell. Buyers did not respond. Six weeks later, Sellers re-extended to Buyers their offer to sell all of their 2,856.54 shares

for $3.1 million. Buyers responded with a counteroffer to purchase a portion of Sellers' shares. Sellers rejected the offer, stating that they were willing to sell all, but not a portion, of their stock.

[¶ 7] Following this exchange, Buyers Wynn Christensen and Renee Hunter filed a complaint against Sellers Burke Christensen and Peggy Miller for declaratory judgment, breach of contract and specific performance. They sought a ruling that they had complied with the stock purchase agreement and that Sellers breached the stock purchase agreement when they rejected Buyers' counteroffer to purchase a portion of Sellers' stock, thus requiring Sellers to transfer the stock to them. They subsequently moved to amend their complaint to add Rex Christensen as an additional plaintiff, Joan Hamblin and Diane Buxton as additional defendants and a new cause of action to enforce a provision of Nola's will restricting the sale of 7–C stock. Sellers answered the amended complaint and then filed a summary judgment motion as to all of Buyers' claims.

[¶ 8] In their motion, Sellers claimed the facts were undisputed that they had complied with the stock purchase agreement requirements by providing notice of their intent to sell. Buyers did not respond to the notice within the 30 days provided in the agreement, and Sellers re-extended the offer. Buyers rejected the second offer and made a counteroffer, leaving Sellers free to sell to a third party. Sellers also claimed it was undisputed that the provision of Nola's will purporting to restrict the sale of 7–C stock contradicted the stock purchase agreement and was, therefore, invalid. On this basis, they argued that they were entitled to judgment as a matter of law on all of Buyers' claims.

[¶ 9] In response to Sellers' motion, Buyers argued that the stock purchase agreement was ambiguous. They also claimed they did not have notice of the stock purchase agreement or Sellers' desire to sell and they exercised their option to purchase under the agreement within the 30 day time period.

---

1. Five of the children own 716.8 shares. Ms. Hamblin and Rex Christensen own 708 shares, 8.8 shares less than the other children because the two traded stock for 1.5 acres of land upon which they each built a home.

Buyers also filed a cross-motion for partial summary judgment, claiming the restrictions in Nola's will precluded Sellers as a matter of law from transferring their stock to a third party without all of the stockholders' consent.

[¶ 10] After a hearing, the district court granted Sellers' motion and denied Buyers' motion. The district court concluded that the pertinent provisions of the stock purchase agreement were not ambiguous and required Sellers to notify the corporate secretary and fellow stockholders of their desire to sell and to give the other stockholders 30 days to respond. On the basis of the undisputed evidence, the district court concluded Sellers complied with these requirements and Buyers did not respond within 30 days. Pursuant to the terms of the agreement, the court concluded that upon expiration of the 30 days, Sellers were permitted to sell their stock to a third party. On the basis of these findings, the district court held that Sellers were entitled to summary judgment in their favor on Buyers' claims for declaratory relief, breach of contract and specific performance. The district court further concluded that the stock transfer restriction contained in Nola's will was invalid because it conflicted with the stock purchase agreement. The district court held that Sellers were entitled to summary judgment on Buyers' claim to enforce the stock transfer restriction in the will. The district court entered an order to that effect from which Buyers timely appealed.

## STANDARD OF REVIEW

[¶ 11] When reviewing an order granting summary judgment, we consider the record *de novo.* *Hincks v. Walton Ranch Co.,* 2007 WY 12, ¶ 7, 150 P.3d 669, 670 (Wyo.2007). Our review of orders granting summary judgment is governed by W.R.C.P. 56(c), which provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We view the evidence in the light most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly drawn from the record. *Id.,* ¶ 8, 150 P.3d at 670. A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. *Gillett v. White,* 2007 WY 44, ¶ 9, 153 P.3d 911, 914 (Wyo.2007). We interpret unambiguous contracts as a matter of law. *Hincks,* ¶ 8, 150 P.3d at 670.

## DISCUSSION

### 1. *The Stock Purchase Agreement*

[¶ 12] Buyers contend the district court misinterpreted the stock purchase agreement when it concluded that it permitted Sellers to sell their stock to a third party. Buyers assert that Article 5 of the agreement unambiguously limits the sale or transfer of stock to the seven siblings and prohibits transfer to anyone else. Sellers claim the district court correctly concluded that, as a matter of law, the stock purchase agreement permitted them to transfer their stock to a third party if Buyers did not exercise their right to purchase the stock within 30 days of receiving notice of Sellers' desire to sell.

[¶ 13] In considering the meaning of a contract, we focus on the parties' intent. *Cathcart v. State Farm Mut. Auto. Ins. Co.,* 2005 WY 154, ¶ 18, 123 P.3d 579, 587 (Wyo. 2005). If possible, we determine their intent from the language used in the agreement. *Id.* Where the language is clear and unambiguous, we limit our inquiry to the four corners of the document, giving the words contained therein their ordinary meaning. *Id.* The parties are free to incorporate within their agreement whatever lawful terms they desire, and we are not at liberty, under the guise of judicial construction, to rewrite the agreement. *Id.* It is only when a contract is ambiguous that we construe the document by resorting to rules of construction. *Id.* A contract is ambiguous if indefiniteness of expression or double meaning obscures the parties' intent. *Id.,* ¶ 18, 123 P.3d at 588.

[¶ 14] One of the stated purposes of the mutual stock purchase agreement was to provide a mechanism by which the stockholders could purchase the shares of any stockholder who during his or her lifetime wished to withdraw from the company. In order to carry out that purpose, the parties agreed to the following provision:

ARTICLE 5. If a stockholder desires to sell his stock during his lifetime, he shall give his associate stockholders and the Secretary of this corporation written notice of such desire, and the associate stockholders shall have the right to purchase such stock at any time within thirty days after such notice at the price determined by Article 7. Each such associate stockholder shall have the right to purchase a proportion of such stock equal to the ratio of the number of shares owned by him to the total shares owned by the remaining associate stockholders excluding the seller, and if a stockholder is unable or unwilling to buy the proportion of stock allotted to him, the other stockholders shall have the right to buy the balance in similar ratio. Upon the consummation of purchase and payment therefore, the Secretary of the corporation shall make the transfer and issue the new certificate and retain possession of the new certificates in case of further sales.

[¶ 15] Considering Article 5 in the context of the entire agreement and giving the words used their plain and ordinary meaning in light of the stated purpose of the agreement, we conclude the agreement *required* any stockholder wishing to sell his stock during his lifetime to give written notice of that desire to the other stockholders and the corporate secretary. We further conclude that the other stockholders *had the right* to purchase the stock, or a proportionate share of it equal to the ratio of the number of shares they owned to the total shares owned by the other stockholders excluding the seller, within 30 days of such notice. If a particular stockholder was unable or unwilling to buy the stock or his proportionate share, the other stockholders *had the right* to purchase the balance. Contrary to Buyers' assertions, the agreement did not require the other stockholders to purchase another stockholder's shares nor did it prohibit a stockholder from selling his stock during his lifetime to a third party if, upon receipt of written notice of the desire to sell, none of the other stockholders exercised their right to purchase the stock or their proportionate share.

[¶ 16] We reiterate: "The parties to [a contract] are free to incorporate within [their agreement] whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the [contract]." *Cathcart,* ¶ 18, 123 P.3d at 587. The parties to the stock purchase agreement incorporated a provision requiring a stockholder to give written notice of his desire to sell and giving the other stockholders the right to purchase the stock. The parties to the stock purchase agreement did not incorporate a provision prohibiting a stockholder from selling his stock to a third party if none of the other stockholders exercised their right of purchase within 30 days after written notice of the desired sale. Construing the stock purchase agreement as incorporating such a prohibition would constitute re-writing the contract to add language not included by the parties. We limit our review to the four corners of the agreement as a whole, in light of all the language used and the intent of the parties at the time they entered into the agreement, and conclude the agreement gave the other stockholders a right of first refusal in the event one stockholder decided to sell. Nowhere, however, did the agreement prohibit a stockholder from selling to a third party or provide that a stockholder could *only* sell to one of the other stockholders.

[¶ 17] Our conclusion in this regard is supported not only by the plain language of Article 5 but also by Article 2, which provided:

ARTICLE 2. Upon the death of each stockholder the survivor and ultimately the sole survivor *shall purchase* and the estate of the decedent *shall sell* the stock interest now owned or hereafter acquired by the stockholder who dies. The purchase or sale price of such stock shall be determined in accordance with the provisions of

Article 7 of this agreement. A surviving stockholder shall purchase that portion of stock owned by the deceased represented by the ratio of the number of shares owned by such survivor to those owned by all the survivors. (emphasis added)

In contrast to the language of Article 5, Article 2 clearly requires the other stockholders to purchase the stock of any stockholder who dies. The use of the word "shall" is mandatory. *Metropolitan Mortgage & Securities Co., Inc. v. Belgarde,* 816 P.2d 868, 878 n. 2 (Wyo.1991). Had the parties to the agreement intended similarly to require the other stockholders to purchase the shares of a stockholder wishing to sell during his lifetime, they could have used the word "shall" in Article 5, just as it was used in Article 2. Instead, the agreement gives stockholders "the right" to purchase the shares of a stockholder wishing to sell during his lifetime. This difference in language suggests the parties' intent was different with respect to the sale of stock after the death of a stockholder and sales during the lifetime of a stockholder.

 [¶ 18] Generally, the law favors the free alienability of property interests. *Box L Corp. v. Teton County ex rel. Board of County Comm'rs of Teton County,* 2004 WY 75, ¶ 11, 92 P.3d 811, 815 (Wyo.2004). Absent language clearly reflecting the parties' intent to restrict the transfer of a property interest, we are not inclined to conclude that was the parties' intent. There simply is no indication in the stock purchase agreement that the parties intended to leave each other no way out if one desired to sell his or her shares and none of the others had the ability to buy them. We affirm the district court's ruling that upon written notice to the other stockholders and corporate secretary of their desire to sell and the passage of 30 days, Sellers had the right to sell their shares to a third party

## 2. The Will Provision

 [¶ 19] Nola's will, executed in 1982, ten years after the stock purchase agreement, provided in pertinent part:

None of the property devised and bequeathed by my will, and particularly the capital stock in 7–C INDUSTRIES, INC., a Wyoming Corporation, may be sold, conveyed in any manner, or encumbered in any way, directly or indirectly during the lifetime of my husband without his specific written consent; and *after the death of my husband, said property* or interests therein, *may, during the lifetime of my children,* or any of them, *only be sold, or conveyed or encumbered in any manner, to my other children, unless all agree otherwise,* with preference given to that person or those persons who will stay on the property, including the property owned by 7–C INDUSTRIES, INC., and keep it intact (emphasis added).

After Nola's death in 1985, her will was submitted for probate in an Idaho district court. From documents submitted with the parties' summary judgment motions in this case, it appears that 134 shares of corporate stock were transferred to each of the seven children pursuant to the will in December of 1986. A copy of the transfer restriction contained in the will was attached to the stock transfers. An order approving the final accounting and distribution and formally closing Nola's estate was entered by the Idaho district court in January of 1987. The order was final and conclusive upon entry and subject to challenge only as provided in the Idaho Uniform Probate Code, § 15–1–101, *et seq.* Any claim that the provision of Nora's will restricting the transfer of 7–C stock was invalid was properly a matter for the Idaho district court. It is not an issue for this Court to decide nor was it an issue for the district court[2] to decide in this action seeking a declaration of the parties' rights under a stock purchase agreement executed ten years prior to the will.

 [¶ 20] In deciding the issue presented, it would be appropriate for this Court to consider evidence of circumstances surrounding execution of the stock purchase agreement in determining the parties' intent.

2. From our review of the record, we conclude the district court ruled only that the will provision had no effect on or validity as to the meaning of the stock purchase agreement. It did not intend its ruling in this action to affect the Idaho probate proceeding.

*Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 26, 126 P.3d 909, 921 (Wyo.2006). It would not be appropriate, however, to consider the will. "Extrinsic evidence," as used in the context of contract construction, "refers to the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties." *Hickman v. Groves,* 2003 WY 76, ¶ 12, 71 P.3d 256, 260 (Wyo.2003). Nola's will, executed in 1982, provides no context to the setting in which the stock purchase agreement was negotiated and signed ten years earlier. Simply put, the will provision at issue is irrelevant to our interpretation of the agreement.

### 3. *Sellers' Offer*

[¶ 21] Buyers' final claim is that the district court incorrectly concluded that Sellers' offer was a valid offer under the terms of the stock purchase agreement, triggering the 30 day response period. Buyers assert, "at most, it was an expression of a desire to bring to an end the stockholders' conflict by selling off property or stock ownership." They further claim the offer did not comply with the agreement because it did not contain a precise sale price in accordance with Article 7.

[¶ 22] Article 5 of the stock purchase agreement provided:

> If a stockholder desires to sell his stock during his lifetime, he shall give his associate stockholders and the Secretary of this corporation written notice of such desire, and the associate stockholders shall have the right to purchase such stock at any time within thirty days after such notice at the price determined by Article 7.

In accordance with this provision, a stockholder who desired to sell his shares was required to give written notice of his desire to the corporate secretary and his fellow stockholders and wait 30 days for their response.

[¶ 23] The evidence was undisputed that between January 10 and 16, 2006, each of the Sellers gave separate written notice to the corporate secretary of their desire to sell all of their shares. It also was undisputed

that by e-mail dated January 14, 2006, Burke Christensen notified Buyers that "The Four of us are definitely willing to sell our shares." There was no dispute that Buyers received the e-mail on or about January 15, 2006, and understood that Burke was speaking on behalf of himself and the three other Sellers when he said they were willing to sell their shares. We agree with the district court that Sellers complied with the notice requirements of the stock purchase agreement.

[¶ 24] Buyers claim that Sellers' "offer" was not a "valid offer" under the stock purchase agreement triggering the 30 day response time. This assertion ignores the plain language of the agreement. The agreement did not require Sellers to make an offer, valid or otherwise, in order to commence the 30 days. Rather, the agreement very clearly required Sellers to give written notice of their desire to sell their stock. That is precisely what the Sellers did; therefore, as a matter of law, they complied with the notice provision.

[¶ 25] Buyers further claim that Sellers' offer did not comply with the agreement because it did not state a precise sale price in accordance with Article 7. This argument also ignores the plain language of the agreement. As stated above, the agreement required only that Sellers give notice of their desire to sell. Nowhere is there language requiring them to state a sale price. To the contrary, the agreement itself establishes the sale price by expressly giving the remaining stockholders the right to purchase the stock at the price determined by Article 7. We agree with the district court's conclusion that when the 30 days passed with no response to Sellers' notice from Buyers, Sellers were free to sell their shares to an outside party.

[¶ 26] Although they were not required to do so by the agreement, Sellers sent Buyers a second notice of their desire to sell dated February 25, 2006. Buyers argue this second notice also failed to satisfy the requirements of the stock purchase agreement because it did not state a sale price in accordance with Article 7. Our conclusion that Sellers fulfilled the requirements of the agreement by giving notice in January and

waiting 30 days makes discussion of the February notice unnecessary. Having fulfilled the requirements, Sellers were free to sell to a third party and had no obligation to give Buyers a second opportunity to purchase their shares. Having no such obligation, they likewise were not required to state a sale price in accordance with Article 7.

[¶ 27] We affirm the district court's order granting summary judgment to Sellers on the claims brought under the stock purchase agreement. We hold the will is not relevant to the issues presented and any challenge to the will should have been made in accordance with the Idaho Probate Code.

[¶ 28] Affirmed.